UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON
No. 5:22-CR-91-GFVT-EBA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **Memorandum Supporting** |
| Plaintiff | ) | **Defendant's Motion to Dismiss** |
| | ) | |
| vs. | ) | |
| | ) | |
| CHRISTOPHER GOINS, | ) | |
| | ) | |
| Defendant | ) | |

The test that we set forth in [*District of Columbia v.*] *Heller* [554 U.S. 570 (2008)] and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.[1]

History does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons.[2]

18 U.S.C. § 922(g)(1) as applied to defendant Christopher Goins, whose only felony conviction is for a non-violent offense, is not consistent with the Second Amendment's text and historical understanding. The government's prosecution of Goins violates his Second Amendment rights. The indictment, therefore, should be dismissed.

## Statement of the Case

### The Charge

The indictment charges defendant Christopher Goins with a single count: a violation of 18 U.S.C. § 922(g)(1) by possession of a firearm following a prior felony conviction. Indictment, R. 1, #1.

### Goins' Previous Felony Conviction

---

[1] *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111, 2131 (2022).
[2] *Kanter v. Barr*, 919 F.3d 437, 464 (7th Cir. 2019)(Barrett, J., dissenting).

1

Goins has what is counted pursuant to U.S.S.G. § 4A1.2(a)(2) as one prior felony conviction. It was not for a crime of violence as defined by U.S.S.G. § 4B1.2(a). Instead, they were for traffic-related offenses and drug possession in Fayette Circuit Court case no. 19-CR-500.[3]

## Argument

### Prosecuting Goins, a non-violent felon, violates the Second Amendment

### A. Introduction

The Supreme Court's recent decision in *New York St. Rifle & Pistol Ass'n v. Bruen*, 142 S.Ct. 2111 (2022), dramatically changed the landscape regarding the scope and application of the Second Amendment.[4] Not only did the Court strike down a state firearm permitting scheme with a pedigree of over 100 years, it established that the determinative question regarding the constitutional validity of a law restricting or impacting an individual's possession of a firearm is whether it is of a type widely and well established not later than by the adoption of the Fourteenth Amendment in 1868.[5] In other words, the inquiry here is a historical one:

---

[3] A true copy of the Fayette Circuit Court judgment is tendered herewith as Ex. 1 to this memorandum.

[4] The Second Amendment to the Constitution provides as follows:

 A well regulated Militia, being necessary to the security of a free State, the right
 of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

[5] "'Constitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.' The Second Amendment was adopted in 1791; the Fourteenth in 1868." *Bruen*, 142 S.Ct. at 2136 (citation omitted).

2

> The test that we set forth in [*District of Columbia v.*] *Heller* [554 U.S. 570 (2008)] and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding. In some cases, that inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment. Likewise, if earlier generations addressed the societal problem, but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. And if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality.

*Bruen*, 142 S. Ct. at 2131.

### B. The *Bruen* majority opinion

*Bruen* is a strident affirmation of the right of Americans to possess and carry arms in public. After some years of lamenting the Second Amendment's "second-class" status,[6] Justice Thomas's opinion for the Court elevates it to the top-most echelon of American liberties.

At particular issue in *Bruen* was a New York state process in which an individual could petition for a permit to carry a firearm in public. The process required a showing of "proper cause." The particulars of the process, and the Court's analysis of its deficiencies are of little moment here. Far more important is Court's bull-dozing of the two-step analytical process for Second Amendment-based challenges that had been widely adopted following the Court's earlier

---

[6] *Silvester v. Becerra*, 138 S.Ct. 945, 945, 950 (2018)(Thomas, J., dissenting from denial of certioriari)("the Second Amendment is a disfavored right in this Court" and "the lower courts are resisting this Court's decisions in *Heller* and *McDonald* and are failing to protect the Second Amendment to the same extent that they protect other constitutional rights."); *Friedman v. City of Highland Park*, 136 S.Ct. 447, 450 (2015)(Thomas & Scalia, JJ., dissenting from denial of certiorari)("I would grant certiorari to prevent the Seventh Circuit from relegating the Second Amendment to a second-class right.").

3

Second Amendment cases, *Heller, supra* and *McDonald v. City of Chicago,* 561 U.S. 742 (2010).[7]

The two-step process required first consideration of whether the challenged law or regulation addressed activity falling outside the scope of the Second Amendment as originally understood. 142 S.Ct. at 2126 (citations omitted). If this first inquiry was inconclusive or if historical evidence suggested that the regulated activity was not categorically unprotected, the court would assess how close the law came to the "core" of the Second Amendment right and the extent of any burden; depending on the outcome of that analysis, a strict or intermediate level of scrutiny would then be applied to the challenged law. *Id.* at 2126-27.

This two-step process derogated the Second Amendment to "second-class" status, and the Court concluded was "one step too many." *Id.* at 2127. "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* Text and history are the guides.

*Bruen* stated that the analysis for a Second Amendment infringement was as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

142 S.Ct. at 2129-30, *quoting Konigsberg v. State Bar*, 366 U.S. 36, 50 (1961).

### C. The Second Amendment text

---

[7] The Sixth Circuit had its version of this two-step process. *See United States v. Greeno,* 679 F.3d 510 (6th Cir.), *cert. denied,* 568 U.S. 922 (2012).

4

> We begin with the text of the Second Amendment:
>
> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

U.S. Const. amend. II.

The text of the Second Amendment, as can be seen, makes no exception for those with any prior felony convictions or other civil disabilities. This absence is "echoed in state constitutional provisions" as "[o]nly one state constitutional provision addressing the right to bear arms contains an exception for felons[,]" this being Idaho's enacted in 1978. C. Larson, <u>Four Exceptions in Search of a Theory: *District of Columbia v. Heller* and Judicial *Ipse Dixit*</u>, 60 Hastings L.J. 1371, 1375 (2009).[8]

Moreover, "the people" to whom the Second Amendment applies are the same "people" to whom the First, Fourth, Ninth and Tenth Amendments apply and/or refer to. Everyone is protected by these amendments, not just some unspecified subset, a point the Supreme Court made unmistakably clear in *Heller*. 554 U.S. at 580-81.

The Second Amendment's plain text covers Goins' possession of the firearm, and presumptively protects and insulates him from prosecution. The question, therefore, is whether 18 U.S.C. § 922(g)(1), as applied to Goins, "is consistent with the Nation's historical tradition of firearm regulation." It is not.

### D. *Heller*'s dicta does not foreclose Goins' challenge

The Supreme Court offered the following dicta in *Heller*:

---

[8] Accessible and downloadable at https://repository.uchastings.edu/hastings_law_journal/vol60/iss6/7/#.

5

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

554 U.S. at 626–27.

Calling to mind Justice Frankfurter's long ago lament that "a hint becomes a suggestion, is loosely turned into dictum and finally elevated to a decision,'" *Wright v. Spaulding*, 939 F.3d 695, 707 (6th Cir. 2019)(Thapar, J., concurring), *quoting United States v. Rabinowitz*, 339 U.S. 56, 75 (1950)(Frankfurter, J., dissenting), the Sixth Circuit, as did many other circuits, at least for a while, seized upon this dicta to reject challenges to § 922(g). *United States v. Khami*, 362 F. App'x 501, 508 (6th Cir. 2010)(rejecting challenge to § 922(g) "[s]ince *Heller* indicates that its holding does not bring into question the constitutionality of § 922(g)(1), and this Court has not been presented with any convincing argument that its dicta should not be very persuasive in this case[.]").

Subsequently, however, the Sixth Circuit recognized in *Tyler v. Hillsdale Co. Sheriff's Dept.*, 837 F.3d 678, 686 (6th Cir. 2016), that *Heller* did not foreclose an as-applied challenge to § 922:

> While we "are obligated to follow Supreme Court dicta," *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002) (citation omitted), *Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis. A presumption implies "that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge." *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)

6

We turn, therefore, to the historical evidence our Nation's traditions of firearm regulation.

### E. Felon-in-possession laws like § 922(g)(1) are not part of our country's historical tradition of firearm regulation

Statutes prohibiting felons from possessing firearms did not appear until the 20th century. "[S]tate laws prohibiting felons from possessing firearms or denying firearms license to felons date from the early part of the twentieth century" C. Larson, *supra*, 60 Hastings L.J. at 1376. "[O]ne can with a good degree of confidence say that bans on convicting possessing firearms was unknown before World War I." C.K. Marshall, Why Can't Martha Stewart Have a Gun? 32 Harv. J.L & Pub. Pol'y 695, 708 (2009).[9]

Founding-era laws, statutes or ordinances prohibiting felons from possessing firearms would be the best evidence of a "historical tradition of firearm regulation" consistent with § 922(g)(1), but "scholars have not been able to identify any such laws." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 209)(Barrett, J., dissenting). "[N]o colonial or state law in eighteenth century America formally restricted the ability to own firearms." Larson, *supra*, 60 Hastings L.J. at 1374. "In sum, felon disarmament laws significantly postdated both the Second Amendment and the Fourteenth Amendment." *Id*. at 1376.

Notwithstanding the absence of any actual laws or statutes from either the founding-era or the 19th century that prohibited felons from possessing firearms, some courts and authorities have claimed that felons have historically been excluded from possessing firearms. Justice Barrett, then a member of the Seventh Circuit, examined these contentions in her dissent in *Kanter v. Barr*,

---

[9] Accessible and downloadable at https://www.harvard-jlpp.com/wp-content/uploads/sites/21/2009/03/marshall_final.pdf.

7

*supra*. This review shows that "[h]istory does not support the proposition that felons lose their Second Amendment rights solely because of their status as felons." Barrett dissent in *Kanter v. Barr* at 464.

The first of these supposed authorities is discussions by three state conventions during the Constitution's ratification process of proposals including language limiting the Second Amendment's scope "arguably tied to criminality." *Id*. at 454. New Hampshire's convention recommended that citizens "in actual rebellion" be disarmed. *Id*., *quoting* 1 Jonathan Elliot, The Debates in the Several State Conventions of the Adoption of the Federal Constitution 326 (2d ed. 1891); *see also* J. Greenlee, The Historical Justifications for Prohibiting Dangerous Persons from Possessing Firearms, 20 Wyoming L. Rev. 249, 266 (2020);[10] Marshall, *supra*, 32 Harv. J.L & Pub. Pol'y at 713. Samuel Adams proposed to the Massachusetts convention that only "peaceable citizens" would retain the right to bear arms. Barrett dissent in *Kanter v. Barr* at 454. Finally, a minority of the Pennsylvania convention came closest with a proposal that those convicted of a dangerous crime and/or otherwise posing a public danger be disarmed. *Id*. at 454-55.

Similar to the one-time and thoroughly discredited notion that the absence of any evidence of weapons of mass destruction in Saddam Hussein's Iraq constituted conclusive proof of their existence, these proposals offer not even a thin reed of support, since "none of their relevant limiting language made its way into the Second Amendment." *Id*. at 455. Only New Hampshire's, which spoke to actual rebellion, even passed its convention. *Id*. Furthermore, the stronger evidence goes the other way: proposals from the other states did not include any similar language of limitation or exclusion and four parallel state constitutional

---

[10] Accessible and downloadable at https://scholarship.law.uwyo.edu/cgi/viewcontent.cgi?article=1434&context=wlr.

provisions enacted before ratification of the Second Amendment did not include any similar limitations or exclusions. *Id.* Proposals discussed but not adopted or enacted cannot establish a historical tradition of firearm regulation.

A second unfounded contention in response "to the dearth of felon-disarmament laws in the eighteenth and nineteenth centuries is to say that such laws would have been unnecessary given the severity with which felons were punished." *Id.* at 458. This argument posits that felons were routinely executed or stripped of all rights and, therefore, explicit provisions depriving them of firearms would have been redundant. *Id.* Justice Barrett concludes, after a historical survey, that "history confirms that the basis for the permanent and pervasive loss of all rights cannot be tied generally to one's status as a convicted felon or to the uniform severity of punishment that befell the class. *Id.* at 461.

A third contention has been that the right to bear arms was similarly limited by a requirement that they be afforded only to "virtuous citizens." *Id.* at 462. The "virtuous citizen" theory posits that felony convictions lead to disqualification of rights like voting and serving on juries and, it would follow, also to bear arms. *Id.* Again, however, a rigorous historical review shows that "the right to arms differs from rights that depend on civic virtue for enjoyment" and "that difference is borne out by historical treatment: we see no explicit criminal, or even more general virtue-based, exclusions from the right to bear arms like we do in other contexts." *Id.* at 464.

Justice Barrett's dissent in *Kanter v. Barr* simply recites some of the law review articles that followed after the Supreme Court's decision in 2008 in Heller, which moved the Second Amendment off the constitutional back-burner. The majority in *Kanter* acknowledged that "we have suggested that felons were not historically understood to have Second Amendment rights[,]" *Id.* at 446, although it ultimately did not decide the issue.

9

## Conclusion

History teaches that laws prohibiting felons from possessing firearms did not become part of this Nation's historical tradition of firearm regulation until the 20th century. As such and in accordance with the teachings in *Bruen*, 18 U.S.C. § 922(g)(1) as applied to Goins must yield to his rights secured by the plain, unambiguous text of the Second Amendment. The indictment, accordingly, should be dismissed.

Respectfully submitted,

BY:  s/Robert L. Abell
ROBERT L. ABELL
120 N. Upper St.
Lexington, KY 40507
859-254-7076 (phone)
859-281-6541 (fax)
E-mail: Robert@RobertAbellLaw.com
COUNSEL FOR DEFENDANT
CHRISTOPHER GOINS

## Certificate of Service

I certify that on September 7, 2022, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to the following:  All Counsel of Record.

BY:  s/Robert L. Abell
Robert L. Abell
COUNSEL FOR DEFENDANT