UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Criminal No. 5:22-cr-00091-GFVT-MAS-1 |
| | ) | |
| V. | ) | |
| | ) | **OPINION** |
| CHRISTOPHER GOINS, | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

Christopher Goins is a convicted felon. He pled guilty to driving under the influence and to possessing drugs in 2019. Because of his actions, Congress deems him unfit to possess a gun. But how can that stand in the face of a constitutional right, an individual right, to be armed? A right that does not include textual exceptions. That is precisely what Christopher Goins wants to know.

To that end, he argues that the recently decided case of *New York State Rifle & Pistol Association v. Bruen*, invoking history and tradition, does not permit a legislature to categorically disarm nonviolent felons. Ultimately, the answer does rest with history.

But as explained below, the British common law that informed our founding era enactments included the power to disarm individuals who posed a danger to public safety. And it is in that world that the Second Amendment emerged. Since Mr. Goins's criminal record suggests that his crimes were similarly dangerous, the Government can prevent him from carrying a gun without violating his Second Amendment right. Consequently, the Court **DENIES** his Motion to Dismiss the Indictment **[R. 15]**.

# I

In 1961, Congress passed the first federal law to prevent felons from receiving a firearm through interstate commerce. An Act to Strengthen the Federal Firearms Act, Pub. L. No. 87-342, 75 Stat. 757 (1961). Seven years later, Congress strengthened this prohibition, banning felons from possessing a gun that had ever traveled in interstate commerce.[1] In its current form, the federal felon in possession law criminalizes possession of a firearm by any person who has been convicted, in any court, of a crime punishable by imprisonment for a term exceeding one year. 18 U.S.C. § 922(g)(1).

In April 2019, the Commonwealth of Kentucky charged Christopher Goins with four felonies. [R. 21-1 at 1.] After Mr. Goins entered a guilty plea, a state court adjudged him guilty of driving under the influence, committing a DUI with a suspended license, possession of a controlled substance, and possession of marijuana. *Id.* at 4. The court sentenced Mr. Goins to two years imprisonment with four years of probation.[2] *Id.* at 7–10.

On August 4, 2022, the United States charged Mr. Goins with possessing a pistol, despite his knowledge of his previous convictions, in violation of 18 U.S.C. § 922(g)(1). [R. 1.] Mr. Goins then moved to dismiss the indictment, arguing that "as applied to him as a nonviolent

---

[1] Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, tit. IV, § 925, 82 Stat. 197, 233–34; *id.* tit. VII, § 1202, 82 Stat. at 236; Gun Control Act of 1968, Pub. L. No. 90-618, tit. I, sec. 102, 82 Stat. 1213, 1220–21; *id.* tit. III, sec. 301, 82 Stat. at 1236 (all codified at 18 U.S.C. § 922(g) (1986)).

[2] Kentucky law defines a fourth offense DUI as a Class D felony, punishable with one to five years of incarceration. Ky. Rev. Stat. Ann. §§ 189A.010(5)(d), 532.060(1)(d) (LexisNexis 2022). Likewise, the Commonwealth classifies a first offense of possession of a controlled substance in the first degree as a Class C or a Class D felony, depending on the quantity of drugs at issue. *Id.* § 218A.1412. Accordingly, Mr. Goins's controlled substance crime carried a penalty of either one to five or five to ten years of incarceration. *Id.* § 189A.010(5)(c)–(d). The court withheld the sentence and only required Mr. Goins to serve 120 days. [R. 21-1 at 7–10.]

felony offender, [Section 922(g)(1)] violates his rights under the Second Amendment of the United States Constitution."[3]  [R. 15 at 1.]

## II

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.  In *District of Columbia v. Heller*, 554 U.S. 570 (2008) and in *McDonald v. Chicago*, 561 U.S. 742 (2010), the Supreme Court clarified that this protection guarantees "the right of an ordinary, law-abiding citizen to possess a handgun in the home for self-defense." *New York State Rifle & Pistol Assoc. v. Bruen*, 142 S. Ct. 2111, 2122 (2022).  Recently, the Court held that the Second Amendment also protects "an individual's right to carry a handgun for self-defense outside the home."  *Id.*  In so doing, the Court replaced the prevailing test for assessing laws that restrict the right to bear arms.  *Id.* at 2125–26.  Previously, federal courts applied a two-step approach that assessed history and then conducted means-end scrutiny.  *Id.* at 2125.  *Bruen* dispenses with the scrutiny analysis and clarifies that only historical analysis is appropriate in Second Amendment cases.  *Id.* at 2126.

## A

Despite the Government's urging, the Court cannot simply adhere to precedent and deny Mr. Goins's motion because courts have upheld Section 922(g)(1) against Second Amendment challenges.  [R. 16 at 4.]  The Government asserts that the Court is bound by two decisions that upheld Section 922(g)(1) in the wake of *Heller*.  These cases rely on statements in the *McDonald*

---

[3] After Mr. Goins moved to dismiss the initial indictment, the United States filed a superseding indictment and charged Mr. Goins with violating 18 U.S.C. §§ 2 and 924(a)(1)(A).  [R. 22.]  Mr. Goins has also moved to dismiss the superseding indictment.  [R. 28.]  This Order only concerns his first motion to dismiss.  [R. 15.]

and *Heller* opinions that felon in possession laws are presumptively valid. *Bruen* diminishes the persuasiveness of these admonitions.

First, in *United States v. Carey*, a felon asked the Sixth Circuit to order a trial court to expunge his conviction for conducting an illegal gambling business. *United States v. Carey*, 602 F.3d 738, 739 (6th Cir. 2010). Mr. Carey claimed that the trial court's refusal to expunge his conviction violated his Second Amendment rights. *Id.* at 740–41. Because his conviction triggered the felon in possession laws, the trial court's decision to keep the conviction on the books prevented him from carrying a gun. *Id.* The Sixth Circuit denied his request. *Id.* at 741. To do so, the panel relied on *Heller's* admonition that "nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons . . . ." *Id.* (quoting *Heller*, 554 U.S. at 627). The court also relied on *United States v. Frazier*, which upheld felon in possession laws after *Heller*. *Id.*

*Frazier* reviewed a conviction under a felon in possession statute for plain error because Mr. Frazier never raised his Second Amendment challenge before the trial court. *United States v. Frazier*, 314 Fed. App'x 801, 806 (6th Cir. 2008). The *Frazier* panel again relied on *Heller's* admonition that its holding did not apply to felon in possession laws. *Id.* at 807. It also relied on pre-*Heller* Sixth Circuit cases upholding these laws and on the fact that "[e]very circuit court which has had occasion to address the issue has upheld § 922 generally against challenges under the Second Amendment." *Id.*

Next the Government cites *United States v. Khami*. [R. 21 at 10]; *United States v. Khami*, 362 F. App'x 501 (6th Cir. 2010). That case again states that the *Heller* admonition "is sufficient to dispose of the claim that § 922(g)(1) is unconstitutional." *Id.* at 507. But the *Khami* panel did acknowledge that the admonition is "dicta . . . ." *Id.* Courts in the Sixth Circuit "are

4

obligated to follow Supreme Court dicta, particularly when there is no substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *Id.* at 508 (quoting *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002)).  Unlike the instant case, *Khami* involved a "facial challenge to this statute, which would require the Defendant to argue that the felon-in-possession statute is unconstitutional as applied to all felons covered by the statute." *Id.*  The panel further commented that "[e]ven an as applied challenge would be difficult for Defendant to mount since he was on electronic tether at the time of the search and had two prior drug felony convictions, which suggests that Defendant likely is within the category of felons to whom the rationale in *Heller* would clearly apply, and therefore for whom Congress can constitutionally restrict the possession of firearms." *Id.*

The Sixth Circuit cases discussing Section 922(g)(1) are distinguishable from Mr. Goins's prosecution for three reasons.[4]  First the Court's obligation to follow Supreme Court dicta does not apply if there is a "substantial reason for disregarding it, such as age or subsequent statements undermining its rationale." *Id.*  Mr. Goins argues that *Bruen* provides a substantial reason to disregard *Heller's* statement that the felon-in-possession laws are presumptively valid. [R. 19 at 1.]  Second, unlike the appellant in *Khami*, Mr. Goins brings an as applied challenge to felon in possession laws rather than a facial one.  [R. 15 at 1.]  Third, the assertion that "[e]very circuit court which has had occasion to address the issue has upheld § 922 generally against challenges under the Second Amendment" is of diminished force given *Bruen's* abrogation of cases applying scrutiny to Second Amendment burdens.

The Court agrees that *Bruen* requires some reconsideration of the *Heller* admonition. *Heller* stated that "nothing in our opinion should be taken to cast doubt on longstanding

---

[4] The Sixth Circuit also rejected a challenged to Section 922(g)(1) in *United States v. Whisnant*, 391 Fed. App'x 426 (6th Cir. 2010).  That decision also relied on the *Heller* admonition, citing *United States v. Carey*. *Id.* at 430.

prohibitions on the possession of firearms by felons . . . ." *Heller*, 554 U.S. at 627. The Supreme Court reiterated its commitment to maintaining the validity of felon in possession laws in *McDonald v. City of Chicago*. *McDonald*, 561 U.S. at 786. But the majority opinion in *Bruen* did not recommit to upholding felon in possession laws. Instead, the admonition appeared in a concurring opinion. *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring).

As the Sixth Circuit stated in assessing a challenge to Section 922(g)(4), "*Heller* only established a presumption that such bans were lawful; it did not invite courts onto an analytical off-ramp to avoid constitutional analysis." *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 686 (6th Cir. 2016) (en banc). And "[a] presumption implies 'that there must exist the possibility that the ban could be unconstitutional in the face of an as-applied challenge.'" *Id.* (quoting *United States v. Williams*, 616 F.3d 685, 692 (7th Cir. 2010)); *accord Kanter v. Barr*, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting) ("[D]oes 'presumptively lawful' mean that such regulations are presumed lawful unless a historical study shows otherwise? Does it mean that as-applied challenges are available?"). Mr. Goins presents an as applied challenge. [R. 15 at 1.] He argues that he is a "nonviolent felony offender." *Id.* Mr. Goins committed a DUI, a DUI with a suspended license, possession of a controlled substance, and possession of marijuana. [R. 21-1 at 4.] He posits that the federal Sentencing Guidelines would not regard these as crimes of violence. [R. 15-1 at 2.] Unlike the appellant in *Khami*, Mr. Goins only claims that Section 922(g)(1) violates the Constitution in its application to him, a nonviolent offender.

Moreover, prior appellate decisions regarding felon in possession laws typically point to the unanimity among circuits that have dismissed Second Amendment challenges to Section

922.[5]  But *Bruen* expressly abrogates a major basis for several of the decisions.  *Bruen* rejects the application of scrutiny to laws that burden Second Amendment rights.  *Bruen*, 142 S. Ct. at 2126.  Thus, *Bruen* calls into question the basis for the unanimity in these opinions.

## B

*Bruen* clarifies that the Second Amendment's meaning at the time that it was enacted defines its scope.  *Bruen*, 142 S. Ct. at 2126, 2137.  Courts must first determine whether "the Second Amendment's plain text covers an individual's conduct . . . ."  *Id.*  If so, "the Constitution presumptively protects that conduct" and the Government must justify its regulation.  *Id.*  To do so, it "must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified control.'"  *Id.* at 2126.  If the Government shows that the regulated conduct "falls beyond the Amendment's original scope, 'then the analysis can stop there; the regulated activity is categorically unprotected.'"  *Id.* (quoting *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012)).

Put differently, *Bruen* requires this Court to analyze two questions.  Does the Second Amendment's plain text apply to Mr. Goins?  *See id.*  If it does, is permanently disarming him consistent with this Nation's historical tradition of firearm regulation?  *See id.*

---

[5] *Eg.*, *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (adopting the history plus scrutiny approach for the circuit for crimes not enumerated in the *Heller* dicta); *Binderup v. Atty. Gen.*, 836 F.3d 336, 344, 345 (3d Cir. 2016), *abrogated by Range v. Atty. Gen.*, 53 F.4th 262 (3d Cir. 2022) (collecting cases that apply heightened scrutiny and then concluding that facial challenges to firearm regulations fail because "to guarantee absolutely the ability to keep and bear arms even in cases where disarmament would survive heightened scrutiny would be a radical departure from our post-*Heller* jurisprudence . . . .").

**1**

*Bruen's* first step requires the Court to assess whether this plain text applies to Mr. Goins. The Second Amendment establishes "the right of the people to keep and bear Arms . . . ." *See Bruen*, 142 S. Ct. at 2129–30. This preliminary analysis asks three questions. Is Mr. Goins one of the people whom the Second Amendment protects? *See id.* at 2134. Is the weapon that Mr. Goins carried in common use today? *See id.* Last, does the plain text of the Second Amendment protect Mr. Goins's specific conduct? *See id.* The parties do not dispute, and the Court is unaware of a reason to doubt, that Mr. Goins's pistol is a weapon that is in common use and that the Second Amendment protects his proposed conduct. Rather, the Government contends that Mr. Goins is not one of the people to whom this right extends.

The respondents in *Bruen* were "part of 'the people' whom the Second Amendment protects" because they were "ordinary, law-abiding, adult citizens . . . ." *Bruen*, 142 S. Ct. at 2134. The United States argues that Mr. Goins, "[a]s a convicted felon, . . . is not in the category of citizens whose gun possession is protected by the Second Amendment." [R. 16 at 1.] Additionally, the United States asserts that "the right to bear arms was tied to the concept of virtuous citizenry and that, accordingly, the government could disarm unvirtuous citizens." [R. 16 at 5 (quoting *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012)).]

**a**

The Government misplaces its reliance on *Bruen's* reference to law abiding citizens. To conduct its preliminary, textual analysis, *Bruen* states that "[i]t is undisputed that petitioner's Koch and Nash—two ordinary, law-abiding citizens—are part of 'the people' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134. The Government reads this statement to indicate that "the Second Amendment extends only to the lawful conduct of law-abiding

citizens." [R. 16 at 3.]  But the Court only stated that law-abiding citizens are part of the people protected by the Second Amendment.  In other words, it is sufficient to be law-abiding to qualify for Second Amendment protection.  The Court did not hold that it is necessary to be law abiding to assert Second Amendment rights.  The issue of whether a non-law-abiding citizen qualifies for Second Amendment protection was not before the Court.  *See Hagy v. Demers & Adams*, 882 F.3d 616, 620 (6th Cir. 2018) ("Article III of the U.S. Constitution does not authorize federal courts to decide theoretical questions. . . . It extends the 'judicial Power' only to 'Cases' and 'Controversies.'") (internal citation omitted).  Thus, the Supreme Court's determination that law-abiding status is sufficient to qualify for protection does not imply that only law-abiding citizens hold rights under the Second Amendment.

**b**

The Government has not carried its burden to establish that Congress can categorically disarm felons because they lack virtue.  *See Bruen*, 142 S. Ct. 2150 (placing the burden on the Government to justify its firearm restriction).  The United States argues that Congress can categorically strip all felons of their Second Amendment rights because "the right to bear arms [is] tied to the concept of virtuous citizenry and that, accordingly, the government [can] disarm unvirtuous citizens."  [R. 16 at 5 (quoting *Carpio-Leon*, 701 F.3d at 979); R. 21 at 3.]  Because history and *Heller* counter the conclusion that the Second Amendment is a civic right, the virtuous citizen argument is unavailing.

The government can strip individuals of certain rights.  *Kanter*, 919 F.3d at 462 (Barrett, J., dissenting).  It has historically denied the voting franchise to entire classes of people for "want of capacity or of moral fitness."  *Id.* (quoting Thomas M. Cooley, A Treatise on the Constitutional Limitations 29 (1st ed. 1868)).  Similarly, this country has a tradition of limiting

the right to sit on a jury to "those members of the polity who [are] deemed capable of exercising it in a virtuous manner." *Id.* (quoting Saul Cornell, *"Don't Know Much About History" The Current Crisis in Second Amendment Scholarship*, 29 N. Ky. L. Rev. 657, 679 (2002)).  Both rights share a common trait; they involve the community writ large conducting self-governance and administering justice.  *Id.*  Thus, they fall into a class of civic, rather than individual, rights. *Id.*

Some scholars paint the Second Amendment in a similar light.  "[T]he right to bear arms does not preclude laws disarming the unvirtuous citizens (i.e., criminals) or those who, like children or the mentally unbalanced, are deemed incapable of virtue." Don B. Kates Jr., *The Second Amendment: A Dialogue*, 49 L. & Contemp. Probs., Winter 1986, at 143, 146; *accord Carpio-Leon*, 701 F.3d 974, 979 *and United States v. Yancey*, 621 F.3d 681, 684–84 (7th Cir. 2010).  These scholars characterize the Second Amendment as a right "exercised by citizens, not individuals[,] . . . who act together in a collective manner, for a distinctly public purpose: participation in a well regulated militia."  Cornell & DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 491 (2004).

This perspective relies on an interpretation of the Second Amendment that *Heller* specifically rejects.  The Second Amendment begins "[a] well regulated Militia, being necessary to the security of a free State . . . ."  U.S. Const. amend. II.  It then continues "the right of the people to keep and bear Arms, shall not be infringed."  *Id.*  *Heller* reasoned that these clauses serve distinct purposes.  The reference to a well regulated militia announces the purpose of the amendment.  *Heller*, 554 U.S. at 577.  The remaining language grants an individual right to bear arms.  *Id.* at 592.  Simply put, "the Second Amendment confers an individual right to keep and bear arms . . . ."  *Id.* at 622.  The right to bear arms is rooted in one's right to defend himself, not

his right to serve in the militia. *Kanter*, 919 F.3d at 463 (Barrett, J., dissenting) (citing *Heller*, 554 U.S. at 582–86). *Heller* leaves no room to use the reference to a well regulated militia to interpret the Second Amendment as a civic right.

History also gives little support to the theory that the Second Amendment embodies a civic right. Ten states adopted constitutions that excluded or permitted the exclusion of "those who 'had committed crimes, particularly felonies or so-called infamous crimes'" from voting by 1820. *Id.* (citing Alexander Keysar, The Right to Vote 62–63 & tbl. A.7) (listing Kentucky, Vermont, Ohio, Louisiana, Indiana, Mississippi, Connecticut, Illinois, Alabama, and Missouri). Likewise, early state legislatures passed laws that explicitly limited jurors to those "of good Moral Character" who had not been "convicted of any Scandalous crime, or be guilty of any gross immorality . . . ." *Id.* n.11 (citing Acts and Laws of the Commonwealth of Massachusetts 173 (Wright & Potter 1898)); *see also id.* n.11 (citing Act of Dec. 17, 1796, § 52, *in* Acts for the Commonwealth of Kentucky 134 (Steward 1796) (jurors must "be of good demeanor").

In contrast, the state analogs of the Second Amendment do not explicitly limit the right to bear arms to virtuous citizens. *Id.* By 1820, nine states had enshrined the right to bear arms in their constitutions. *Id.* None of them made an exception for criminals. *Id.* at 463–64. Seven of these nine states included explicit limitations on criminals' right to vote in their constitutions. *Id.* at 464. Had early legislatures understood a virtue limitation to apply to the right to bear arms, they would have explicitly included it as they did with the voting franchise. *Id.* at 464. Because the virtuous citizen theory is inconsistent with history and *Heller*, the Government cannot rely on it to justify universally stripping felons of their Second Amendment rights.

11

**c**

Moreover, the Court is unconvinced that the preliminary, textual analysis of the phrase "the people" is the appropriate point to analyze the scope of the Second Amendment.  There is a divide in cases as to whether the scope should be assessed relative to the people that it protects or with regard to the burdens on firearm possession that it permits.  Some jurists claim that there are entire classes of people, felons for example, who are excluded from the Second Amendment. *See Binderup v. Atty. Gen.*, 836 F.3d 336, 347, 357 (3rd Cir. 2016), *abrogated by Range v. Atty. Gen.*, 53 F.4th 262 (3d Cir. 2022).  Others acknowledge that all people possess the right, but history confirms that Congress can strip certain groups of it.  *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting) (citing Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1497–98 (2009)).  The first approach defines the scope of the right by assessing who possesses it, and the other inquires as to when the Government may take it away.  *Id.*  Ultimately, both approaches use analysis of history and tradition to assess whether disarming a group is justified.  *Compare Binderup*, 836 F.3d at 347 (a challenger must first "identify the *traditional justification* for *excluding* from Second Amendment protections the class of which he appears to be a member") (emphasis added) *with Kanter*, 919 F.3d at 453 (Barrett, J., dissenting) ("the question is whether the government has the power to disable the exercise of a right that they otherwise possess, rather than whether they possess the right at all.").

These two approaches may appear to be a matter of semantics, but the first approach could yield an odd result.  If some people fall entirely outside of the Second Amendment's scope, then no state action is required to disarm them.  *Kanter*, 919 F.3d at 452 (Barrett, J., dissenting).  For example, a felon would lose his Second Amendment rights the moment that he

12

is convicted, even if Congress had not passed a law to disarm him. *Id.* This approach would lead to judges' interpretation of the scope of the Second Amendment, rather than Congress's consideration of the benefits to society of disarming certain groups, determining which groups are disarmed. *Id.*

Taking the right to bear arms away from people *ab initio* also risks more permanent limitations on the right than committing it to legislative discretion. Consider a law under which Congress chooses to disarm DUI convicts for ten years. *See id.* (contemplating a domestic violence law). If Mr. Goins is not one of the people protected by the amendment, he could find himself in an extraordinary predicament twenty years after his DUI conviction. He would be beyond the period for which Congress sought to disarm him. But he would lack standing to assert a Second Amendment claim if authorities nevertheless tried to disarm him. *See id.* "If the justification for the initial deprivation is that the person falls outside the protection of the Second Amendment, it doesn't matter if the statutory disqualification expires." *Id.* "That is a rather unusual way of thinking about rights. In other contexts that involve the loss of a right, the deprivation occurs because of state action, and state action determines the scope of the loss (subject, of course, to any applicable constitutional constraints)." *Id.* at 452–53.

Treating some groups as not part of the people protected under the Second Amendment is also inconsistent with *Heller*. *Id.* at 453. *Heller* determined that the Second Amendment's use of "the people" is consistent with the other six provisions of the Constitution that reference "the people." *Heller*, 554 U.S. at 580. In those provisions, the people "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* This established "a strong presumption that the Second Amendment right . . . belongs to all Americans." *Id.*

13

Construing the reference to the people broadly and then contemplating Congress's power to disarm some groups also fits better into *Bruen's* framework. *Bruen* engaged in a rather simple textual inquiry at the outset. *See Bruen*, 142 S. Ct. at 2135. Then, *Bruen* turned to history. *Id.* at 2135–36. In particular, the Court asked "whether modern and historical regulations impose a comparable burden on the right of armed self-defense . . . ." *Id.* at 2133. *Bruen* analysis of the scope of the Second Amendment focuses on the actions by Congress that it permits and prohibits. *See Id.* at 2126 ("Only if *a firearm regulation* is consistent with this Nation's *historical tradition* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'") (emphasis added). Accordingly, the Court will assess history relative to the burden placed upon Mr. Goins's right to bear a firearm for self-defense by Section 922(g)(1) rather than relative to whether he is one of the people entitled to claim the Second Amendment.

## 2

History supports Congress's decision to strip Mr. Goins of his right to bear arms. History is especially relevant in analyzing the Second Amendment because it is an inherited right. *Bruen*, 142 S. Ct. at 2127, 2130. That said, a court is not "obliged to sift the historical materials for evidence to sustain [the Government's] statute." *Id.* at 2150. That burden belongs to the United States. *Id.* Indeed, to resolve a legal question that requires historical analysis, courts are dependent upon "the principal of party presentation." *Stevens v. Mich. State Court Admin. Office*, No. 21-1727, 2022 U.S. App. LEXIS 23214, *16 (6th Cir. Aug. 18, 2022) (citing *Bruen*, 142 S. Ct. at 2130 n.6). This Court's role is to decide the case "based on the historical record compiled by the parties." *Id.*

To find that firearm activity is unprotected by the Second Amendment, a court must compare and contrast the modern law at issue to some historic analog. *Id.* at 2132. Selecting the historic analog is key. Not every historic firearm regulation is "relevantly similar" for the purposes of *Bruen* analysis. *Id.* But the laws need not be identical; they need merely be a "representative historical *analogue*, not a historical *twin*." *Id.* at 2133. Two key metrics guide a court in selecting relevantly similar laws: "how and why the regulations burden a law-abiding citizen's right to armed self defense." *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.*

The timing of the historical law is also relevant under *Bruen*. "[W]hen it comes to interpreting the Constitution, not all history is created equal." *Id.* at 2136. "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them." *Heller*, 554 U.S. at 634–35. Because the Constitution inherited the protections enshrined in the Second Amendment from England, English regulations may be used. *Bruen*, 142 S. Ct. at 2136. But ancient English laws that had fallen into disuse by the time of the drafting of the Constitution should not be used. *Id.* Rather, deeply rooted "precedent stretching from Bracton to Blackstone" is indicative of the Second Amendment's original scope. *Id.* Still, 1791, the year of the adoption of the Bill of Rights, is the most relevant time. *Id.* at 2137.

**a**

The best evidence that Congress has the power to strip Mr. Goins of his Second Amendment rights would be founding-era laws that also deprive felons of firearms. *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *see also Bruen*, 142 S. Ct. at 2131 (the absence of an 18th century regulation can be evidence that an analogous modern law is unconstitutional). The

15

Government points to two sources of founding era law to support Section 922(g)(1).  First, it discusses proposed revisions to the Second Amendment raised during the Pennsylvania and Massachusetts conventions to ratify the Constitution.  [R. 21 at 3–4.]  Second, the United States also asserts that the severity of punishment that American colonies inflicted upon felons justifies disarming them.  *Id.* at 2.

**i**

The Government points the Court to proposed revisions to the Second Amendment raised during the Pennsylvania and Massachusetts conventions to ratify the Constitution.  [R. 21 at 3–4.]  A proposal by the Pennsylvania Anti-Federalists would have curtailed the Second Amendment "for crimes committed or real danger of public injury from individuals."  *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011).  At the Massachusetts convention, Samuel Adams proposed language that "would have forbidden Congress to prevent 'the people of the United States, who are peaceable citizens, from keeping their own arms.'"  *Id.* at 1183 (quoting Journal of Convention: Wednesday February 6, 1788, *reprinted in Debates and Proceedings in the Convention of the Commonwealth of Massachusetts Held in the Year 1788*, at 86 (Boston, William White 1856)).  A proposal at the New Hampshire convention also included "limiting language arguably tied to criminality."  *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting).

These proposals are of limited help.  First, the states ultimately adopted the Second Amendment without any of the proposed limiting language.  *Id.* at 455.  Second, only the New Hampshire proposal managed to carry a majority of its convention.  *Id.*  Third, the other states that proposed adding a right to arms to the federal constitution did not limit the scope of the right.  *Id.*  Moreover, the state constitutions that protected the right to bear arms when the Second Amendment was adopted contained no exclusionary language.  *Id.*  Ultimately, these were

16

merely suggestions that did not carry their conventions and are not indicative of a consensus that the right to bear arms was limited to persons without a criminal record. However, they do indicate that "concern . . . about threatened violence and the risk of public injury . . . animated English and early American restrictions on arms possession." *Id.* at 456.

### ii

The Government also asserts that the severity of punishment that American colonies inflicted upon felons justifies disarming them. [R. 21 at 2.] "The concept of felonies and their consequences, often death or forfeiture of property for even nonviolent felonies, were incorporated into the American colonies from England." *Id.* (citing *Folajtar v. Attorney General*, 980 F.3d 897, 904 (3d Cir. 2020)).

England and Scotland punished several crimes, both violent and nonviolent, with death. *Folajtar*, 980 F.3d at 904. These crimes varied from the quintessential crimes of violence, like rape, arson, and murder, to offenses that do not cause bodily harm, such as unlawful hunting and repeated forgery. *Id.* (citing Francis Bacon, *Preparation for the Union of Laws of England and Scotland*, *in The Works of Francis Bacon* 163–64 (Basil Montagu ed., Cary & Hart 1884)). Initially, the common law contained relatively few felonies. *Id.* But Parliament expanded the list to include at least one hundred and sixty crimes. *Id.* (citing 4 William Blackstone, *Commentaries* *18). The American colonists brought these crimes, and their punishments, with them from England. *Id.* (citing *Baze v. Rees*, 553 U.S. 35, 94 (2008) (Thomas, J., concurring) (citing Stuart Banner, *The Death Penalty: An American History* 23 (2002)).

Felonies historically carried a harsh civil penalty as well. The term felony originally referred to a "breach of the feudal obligations between lord and vassal." *Id.* at 904 (quoting Will Tress, *Unintended Collateral Consequences: Defining Felony in the Early American Republic*,

17

57 Clev. St. L. Rev. 461, 463 (2009)).  The consequence was "forfeiture of goods and the escheat of the fief."  *Id.*  This practice evolved alongside the crimes considered to be felonies, and the common law eventually imposed a judgment of attainder coincident to a judgement of death.  C. Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 715 (2009).  A judgment of attainder forfeited the felon's real property and adjudged them to have a corruption of blood.  *Id.*  The corruption of blood prevented a felon from ever again "inheriting, retaining, or transmitting by descent any 'lands or other hereditaments.'"  *Id.*  Thus, English felons lost the property that they owned at the time of their conviction, the ability to own property in the future, and the ability to bequeath property to their descendants.

Some courts have seized upon the severity of felon punishment during the founding era to justify excluding modern felons from the scope of the Second Amendment.  *E.g.*, *Folajtar*, 980 F.3d at 905.  But not every aspect of the English tradition made its way to America.  *See Kanter*, 919 F.3d at 459 (Barrett, J., dissenting).  More to the point, not every practice of the English common law is relevant for *Bruen* analysis.  *Bruen*, 142 S. Ct. at 2136.  If a practice had become obsolete in England or was disregarded by the colonies at the time of the adoption of the Second Amendment, then the practice has diminished bearing on assessing the validity of a modern firearm regulation.  *See id.*

It is easy to argue that, if the founders would strip felons of all future belongings, or even kill them, then modern Congress can strip them of their guns.  But, to do so, one must rely on the faulty premise that the colonies fully adopted these practices.  The civil consequences, and the future implications of corruption of blood, did not follow the colonists to America in their strict English form.  Marshall, *supra*, at 715.  An early American annotation to William Blackstone's work read "[c]onfiscations, forfeitures, and corruption of blood, do not follow in case of

18

conviction or attainder for any treason or felony either in the commonwealth of Virginia, or under the federal government." *Id.* (quoting 5 William Blackstone, Commentaries *386–87 (St. George Tucker ed., 1803) (1767)).

It is also unclear that the colonies and early states universally applied the death penalty to felonies. As the number of American felonies continued to grow, capital punishment came to be used sparingly, and several categories of felonies "were, on the whole, not capital." *Kanter*, 919 F.3d at 459 (Barrett, J., dissenting) (quoting Lawrence M. Friedman, Crime and Punishment in American History 42 (1993)). By the time of the founding, some states continued to impose the death penalty for felonies, but the extent of the use of capital punishment varied by state. *Id.* James Madison observed that, in America, the meaning of the term felony was "not precisely the same in any two of the States; and varie[d] in each with every revision of its criminal laws." *Id.* (quoting The Federalist No. 42, at 228 (J. R. Pole ed., 2005)). All this is to say that "[t]hose who ratified the Second Amendment would not have assumed that a free man, previously convicted, lived in a society without any rights and without the protection of the law." *Id.* at 461.

**b**

Nevertheless, the United States has carried its burden and shown that history supports disarming individuals who, like Mr. Goins, have committed crimes that indicate they are a danger to public safety. The Government suggests that the colonists "understood that they could disarm those who committed serious crimes such as felonies." [R. 21 at 2.] While the history regarding serious crimes and felonies is unclear, the common law does provide support for an historic power to disarm dangerous people.

Courts can look to English history and custom prior to the founding because "the Second Amendment 'codified a right "inherited from our English ancestors.""" *Bruen*, 142 S. Ct. at

2138–39 (quoting *Heller*, 544 U.S. at 599 and *Robertson v. Baldwin*, 165 U.S. 275, 281 (1897)).

While English common law is not coextensive with American law, British institutions that

existed at the time of the adoption of the constitution are relevant. *Id.* Ancient English laws that

had fallen into disuse by the time of the drafting of the Constitution are not relevant. *Id.* at 2136.

But deeply rooted "precedent stretching from Bracton to Blackstone" are. *Id.*

The English common law tradition of disarming citizens dates to the 14th century. The

Statute of Northampton originated during a turbulent period of English history, after Edward II

was deposed by force of arms and his son, Edward III, took the throne. *Id.* at 2139. At that time

"tendency to turmoil and rebellion was everywhere apparent throughout the realm." *Id.* (quoting

N. Trenholme, The Risings in the English Monastic Towns in 1327, 6 Am. Hist. Rev. 650, 651

(1901)). "[B]ands of malefactors . . . harried the country, committing assaults and murders,"

which led to a "decay in English national life." *Id.* (quoting K. Vickers, England in the Later

Middle Ages 107 (1926)).

From that chaos, the Statute of Northampton emerged, and it "provided that, with some

exceptions, Englishmen could not 'come before the King's Justices, or other of the King's

Ministers doing their office, with force and arms, *nor bring no force in affray of the peace*, nor to

go nor ride armed by night nor by day, in Fairs, Markets, nor in the presence of the Justices or

other Ministers, nor in no part elsewhere, *upon pain to forfeit their Armour to the King*, and their

Bodies to Prison at the King's pleasure." *Id.* (quoting 2 Edw. 3 c. 3 (1328)) (emphasis added).

Most early violations of the statute constituted breaches of the peace. *Id.* at 2140 (citing

Calendar of the Close Rolls, Edward III, 1327–1330, at 402 (July 7, 1328); *id.*, Edward III,

1333–1337, at 695 (Aug. 18, 1336) (1898)).

20

By the latter half of the 17th century, the Statute of Northampton had fallen into disuse. *Id.* at 2140–41. But it was not irrelevant. The English government relied on it during the prosecution of a political detractor of James II. *Id.* Sir John Knight allegedly violated the Statute when he "did walk about the streets armed with a gun, *to terrify the King's subject*s." *Id.* at 2141 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K. B. 1686)) (emphasis added). Chief Justice Herbert summarized the statute's remaining relevance as "that the act of 'go[ing] armed *to terrify the King's subjects*' was 'a great offence at the common law' and that the Statute of Northampton 'is but an affirmance of that law.'" *Id.* (quoting 3 Mod., at 118, 87 Eng. Rep., at 76) (emphasis added).

During the period of English history that is most relevant to understanding the Second Amendment, the Crown's power to disarm its subjects depended upon some showing that they endangered the public. *See id.* at 2140 ("we consider this history '[b]etween the [Stuart] Restoration [in 1660] and the Glorious Revolution [in 1688]' to be particularly instructive"). Indeed, England enacted a law during this time explicitly focused on dangers to the peace. Under the Military Act of 1662, officers of the Crown could "disarm anyone they judged to be 'dangerous to the Peace of the Kingdom.'" *Kanter*, 919 F.3d at 456 (Barrett, J., dissenting) (relating the Military Act to *Sir John Knight's Case*).

Moreover, the Statute of Northampton remained in effect after the passage of the English Bill of Rights, the precursor to our Second Amendment. *Bruen*, 142 S. Ct. at 2141–42. The English Bill of Rights of 1689 guaranteed that "Protestants . . . may have Arms for their Defence suitable to their Conditions, and as allowed by law." *Id.* (quoting 1 Wm. & Mary c. 2, § 7, in 3 Eng. Stat. at Large 417 (1689)). Writing in 1716, Serjeant William Hawkins summarized the state of English law as "no wearing of Arms is within the meaning of [the Statute of

Northampton], unless it be accompanied with such Circumstances as are apt to terrify the People." *Id.* at 2142 (quoting 1 Pleas of the Crown 136). "Persons of Quality" did not run the risk of violating the Statute because "they had no '[i]ntention to commit any Act of Violence or Disturbance of the Peace.'" *Id.* (citing 1 Pleas of the Crown 136 and T. Barlow, The Justice of Peace 12 (1745)).

Later in the 18th Century, Sir William Blackstone articulated the British common law as traditionally granting subjects "a right to have arms for their defense, 'suitable to their condition and degree' and 'under due restrictions.'" *Bena*, 664 F.3d at 1183 (citing 1 William Blackstone, *Commentaries* \*139). Blackstone clarified that the right was "subject to 'necessary restraints' . . . designed to prevent 'what would be pernicious either to ourselves or to our fellow citizens.'" *Id.* (citing 1 William Blackstone, *Commentaries* \*140).

England used its power to protect the public to disarm groups that it considered to be threats to the peace. *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting). Specifically, Parliament disarmed Catholics because English Protestants feared revolt, massacre, and counter-revolution from Catholics. *Id.* (citing Joyce Lee Malcolm, To Keep and Bear Arms 18–19, 122 (1994)). Similarly shameful disarmament policies carried over to the colonies. Based on concerns that Catholics bore allegiance to a foreign sovereign, some colonies required Catholics to swear allegiance to the Crown to bear weapons. *Id.* n.6. After the revolution, these laws required Catholics to swear allegiance to the sovereign and to the independent states. *Id.*

Founding era legislatures also disarmed other groups that they determined to pose "immediate threats to public safety and stability." *Id.* at 458 (citing Joyce Lee Malcom, To Keep and Bear Arms 140–41 (1994) and Adam Winkler, Gunfight 115–16 (2011)). Both before and after the revolutionary war, states disarmed slaves and Native Americans. *Id.* Some states even

22

constitutionalized these ignominious practices.  *Id.* (citing Volokh, 11 Tex. Rev. L. & Pol. at 208–09).  These laws arose out of fear that slaves and Native Americans would use guns to revolt.  *Id.* (citing Adam Winkler, Gunfight 115–16 (2011)).  While these practices have no place in modern America, they do represent a historic tradition of disarming groups that the legislature views as "threaten[ing] the 'public safety.'"  *Id.* (quoting Adam Winkler, Gunfight 115–16 (2011)).

The Government asserts that these early state disarmament laws show that "[t]he history and tradition relevant to the Second Amendment supports categorically disarming felons regardless of whether they are deemed violent or nonviolent."  [R. 21 at 1.]  Several colonial states conditioned gun ownership on swearing allegiance to the state or to the country.  *Carpio-Leon*, 701 F.3d at 980 (citing Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)).  For example, Pennsylvania prohibited individuals who would not swear an oath to the state from "carrying firearms or keeping firearms at their house."  [R. 21 at 1–2 (citing *Folajtar*, 980 F.3d at 908).] Connecticut went so far as to disarm "those who defamed or libeled acts of Congress . . . ." *Folajtar*, 980 F.3d at 908.  The Government relies on the Connecticut law to suggest that "the framers were interested in disarming those whose acts ran 'counter to society's welfare, whether by violent or nonviolent acts.'"  [R. 21 at 2 (citing *Folajtar*, 980 F.3d at 909).]

These laws share much in common with their English ancestors that Parliament passed to disarm Catholics.  Parliament considered Catholics to pose a risk of revolt because they bore loyalty to a foreign sovereign, the Pope, rather than the English crown.  *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (citing Joyce Lee Malcolm, To Keep and Bear Arms 18–19, 122 (1994) (explaining that Protestants feared revolt, massacre and counter-revolution from Catholics) and

Marshall, *supra*, at 723 ("In short, the stated principle supporting the disability was cause to fear that a person, although technically an English subject, was because of his beliefs effectively a resident enemy alien liable to violence against the king.").  Shortly after war with England, the newly independent states faced continued rebellion from their citizens and disarmed those viewed as unwilling to commit to peace.  *See Carpio-Leon*, 701 F.3d at 980 ("[A]fter Shays' Rebellion, to obtain a pardon for taking up arms against the state, Massachusetts required swearing allegiance to the state and giving up firearms for three years.")  The early states confiscated "guns from those who refused to swear an oath of allegiance . . . to 'deal with the potential threat coming from armed citizens who remained loyal to' another sovereign."  *Kanter*, 919 F.3d at 457 (Barrett, J., dissenting) (quoting Saul Cornell & Nathan De-Dino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004)).

Thus, the early American disarmament laws are not as divorced from the distinction between violent and non-violent offenders as the Government claims.  Instead, these laws are but another example of a legislature disarming a group that it deemed to be dangerous to public safety.  *See id.* at 458 ("[F]ounding era legislatures categorically disarmed groups whom they judged to be a threat to the public safety.").  Indeed, a review of the evolution of the common law and of its adoption in the colonies shows a consistent theme.  From Bracton to Blackstone, the common law understood that the sovereign could strip individuals of weapons if it deemed them violent or a threat to disturb the peace.  The colonists inherited this understanding as well.

By contrast, the record regarding colonial understanding that felons were automatically excluded from the right to bear arms is far more uneven.  So too is the history of the colonies' implementation of capital punishment and civic death as to all felons.  By far the most consistent

theme that emerges from history is that the Government could disarm those who were violent or a threat to the peace.

Simply put, the history and tradition relevant to the Second Amendment support Congress's power to disarm those that it deems dangerous. *Id.* at 464. Congress can base the decision to disarm a class of people upon modern judgments as to "the categories of people whose possession of guns would endanger the public safety . . . ." *Id.*; *see also Bruen*, 142 S. Ct. at 2133 ("[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are '"*central*"' considerations when engaging in an analogical inquiry.").

## C

There is little reason to doubt that Congress could have deemed Mr. Goins to represent a threat to public safety, consistent with the Second Amendment's history and tradition. Courts that have considered as applied challenges to felon in possession laws generally start with a strong presumption that Congress was correct in deeming felons to have a proclivity for violence or a tendency to disturb the peace. *See Binderup*, 836 F.3d at 351 ("[W]e will presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise."). However, legal scholarship posits that modern criminal codes punish some individuals with felony length sentences who provide no cause for concern that they pose a danger to public safety. *See Kanter*, 919 F.3d at 451 (Barrett, J., dissenting) (arguing that a conviction of "mail fraud for falsely representing that [Mr. Kanter's] company's therapeutic shoe inserts were Medicare-approved" lacked "individual markers for risk . . . ."); *See also* Marshall, *supra*, at 695–96 (wondering why disarming Martha Stewart, who was convicted of obstruction of justice, making false statements, and two counts of conspiracy in

connection with insider trading, makes the public safer). But Mr. Goins's criminal record shows several reasons to suspect that an armed Christopher Goins could make the public less safe.

First, Mr. Goins's fourth DUI conviction evinces a willingness to disregard the harm that his actions could inflict upon the public. As the Government argues, the Supreme Court has recognized that "individuals 'who drive with a BAC significantly above . . . the limit of .08% and recidivists' [are] 'the most dangerous offenders.'" [R. 21 at 9 (citing *Holloway v. Atty. Gen.*, 948 F.3d 164, 173 (3d Cir. 2020)).] The drivers involved in nearly 30% of traffic fatalities in the United States are drunk. *Drunk Driving*, NHTSA, https://www.nhtsa.gov/risky-driving/drunk-driving (last visited Dec. 13, 2022). "Driving while intoxicated presents a fundamental threat, perhaps more dangerous than the threat presented by other crimes of violence." *United States v. Lopez-Galvez*, 429 Fed. App'x 567, 574 (6th Cir. 2011). Every time that Mr. Goins drove drunk, "he no doubt risked his own life as well as countless others." *Id.* Four DUIs provide ample indicia of risk to conclude that Mr. Goins remains a threat to public safety.

Moreover, the Court agrees with the Government that Mr. Goins's drug crimes justify stripping him of his Second Amendment rights. [R. 21 at 9.] Congress is aware "that drugs and guns are a dangerous combination." *Smith v. United States*, 508 U.S. 223, 240 (1993) (citing statistics on the percentage of murders relating to the drug trade). A court judged Mr. Goins guilty of possession of a controlled substance and possession of marijuana. [R. 21-1 at 4.] Serious drug offenses, like distribution or possession with intent to distribute, are inherently violent offenses that justify disarming those who commit them. *See United States v. Torres-Rosario*, 658 F.3d 110, 113 (1st Cir. 2011).

While Mr. Goins's convictions are only for possession, they flag him as having an above average chance of committing further crimes. Surveys indicate that as many as 17% of state

prisoners and 18% of federal inmates claim to have committed their offenses to obtain money for drugs. *Drug Use and Crime*, Bureau of Justice Statistics (June 1, 2021), https://bjs.ojp.gov/drugs-and-crime-facts/drug-use-and-crime. A study of drug court participants nationwide found that 16.4% of drug court graduates committed a subsequent felony level offense within a year of graduating. John Roman, Wendy Townsend, & Avinash Singh Bhati, Recidivism Rates for Drug Court Graduates 2 (2003), https://www.ojp.gov/pdffiles1/201229.pdf. That number increases to 27.5% two years from graduation. *Id.* Mr. Goins's drug offenses indicate that he is more likely than the average person to commit a future felony, marking him as the sort of threat to public safety that Congress can permissibly seek to eliminate by stripping him of his Second Amendment rights.

### III

Mr. Goins wants the Court to find that he is like Martha Stewart. [R. 19 at 9.] A court convicted Ms. Stewart of obstruction of justice, making false statements, and two counts of conspiracy in connection with insider trading. Marshall, *supra*, at 695–96. Perhaps these crimes would provide little assurance that disarming Ms. Stewart would contribute to public safety. That is a question for another day. But Christopher Goins is not Martha Stewart. His crimes represent a more serious and direct threat to public safety. Accordingly, for the reasons stated, Mr. Goins's Motion to Dismiss the Indictment **[R. 15]** is **DENIED**.

This the 21st day of December 2022.



Gregory F. Van Tatenhove
United States District Judge

27